ELIZABETH DEAN; AMBER GILCHRIST; )
MELANIE HICKMAN; LATRICIA MCGEE; )
MARK PARKER; MARIA WARD; CURTIS )
WARDWELL; and ALANNAH WILSON, )
                                  )
    **Plaintiffs,** )
                                  )    **Case No. 3:12-cv-0157**
**v.** )    **Judge Aleta A. Trauger**
                                  )
DRAUGHONS JUNIOR COLLEGE, INC. )
d/b/a DAYMAR INSTITUTE; DAYMAR )
HOLDINGS, INC.; DAYMAR PROPERTIES )
OF CLARKSVILLE, LLC; DAYMAR )
PROPERTIES OF MURFREESBORO, LLC; )
DAYMAR PROPERTIES OF NASHVILLE, )
LLC; DAYMAR COLLEGES GROUP, LLC.; )
MARK A. GABIS; and UNKNOWN )
DEFENDANTS, )
                                  )
    **Defendants.** )

## MEMORANDUM

Pending before the court is the defendants' Motion to Compel Arbitration and Dismiss or

Stay (Docket No. 12) ("Motion to Compel Arbitration"), to which the plaintiffs filed a Response

in opposition (Docket No. 48), and the defendants filed a Reply (Docket No. 51). For the

reasons stated herein, the motion will be denied.

## BACKGROUND

**I.**    <u>Overview</u>[1]

---

[1]The court's prior Memorandum denying the plaintiffs' Motion to Remand details the
factual and procedural history of this case. *See Dean v. Draughons Junior College, Inc.*, No.
3:12-CV-0157, 2012 WL 2357492, at *1-*2 (M.D. Tenn. June 20, 2012) [Docket No. 39 in this
case; associated Order at Docket No. 40].

The plaintiffs are eight current and former students at one of three "Daymar Institute" campuses in Tennessee. They have filed this case as a putative class action against the defendants, who allegedly operate or assist in operating the Daymar campuses in Tennessee, among other states. (*See* Docket No. 1, Attachment No. 2, Compl.) The plaintiffs allege that the defendants engaged in a variety of false or deceptive practices in promoting the Daymar Institute, including making false or materially misleading statements regarding its career placement statistics, the quality of its faculty and associated educational services, the transferability of credits earned at Daymar to other educational institutions, Daymar's accreditation, the costs of an education at Daymar, conditions relating to the sale of textbooks, and the terms and availability of student loans and other financial aid.

The plaintiffs contend that, based on these misrepresentations, they were induced to enroll at Daymar, to purchase textbooks at inflated rates, and to accrue significant educational debt through loans that Daymar assisted them in securing. According to the Complaint, the "[p]laintiffs became indebted to the extent of thousands of dollars in order to receive the Degrees that were fraudulently induced and for which [sic] they could not transfer. In each case, the plaintiffs were unable to use the degrees for any useful professional or business purpose, leaving them in debt and having wasted both [sic] significant amounts of money, resources and time . . . ." (Compl. ¶ 76.)

The plaintiffs assert claims for declaratory and injunctive relief, conspiracy, breach of contract, breach of implied contract, fraudulent inducement, violation of the Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-101 *et seq.*), Tennessee antitrust violations, fraud, and misrepresentation. The plaintiffs seek compensatory damages for "time lost in

seeking [Daymar] Degrees without the value promised," reimbursement with pre-judgment interest of all loans taken out to pursue these degrees, and "all damages they have sustained as a result of the wrongful acts of the Defendants herein, including pain and suffering to the extent mental and physical, lost income opportunities, and lost time for the legitimate pursuit of advanced education." (Compl. ¶¶ 111.) The plaintiffs also seek punitive damages for the defendants' "malicious willful and wanton conduct and gross negligence." In total, the plaintiffs demand $25,000,000 "for both compensatory and punitive damages." (Compl. at p. 24.) The plaintiffs have brought this case on behalf of themselves and a proposed class consisting of current and former Daymar students who were fraudulently solicited to attend Daymar institutions in Tennessee. (*Id.* ¶¶ 78-82.)

## II.     **The Defendants' Motion to Compel Arbitration**

The defendants have moved to compel arbitration, contending that the plaintiffs must arbitrate this case under the terms of a Student Enrollment Agreement that each plaintiff signed as a condition of enrolling in Daymar.

The Student Enrollment Agreement contains an arbitration clause on its back page ("Arbitration Clause"), which itself contains a provision purporting to delegate to an arbitrator the issue of whether the Arbitration Clause is enforceable in the first place (the "Delegation Provision"). The Arbitration Clause obligates the parties to share the arbitration expenses equally, requires the parties to bear their own costs and expenses, and requires that the arbitration be governed by the Commercial Rules of the American Arbitration Association ("AAA"). The Arbitration Clause also states that its provisions, including its validity, are

governed by Kentucky law.[2]

In response, the plaintiffs argue that, notwithstanding the Delegation Provision, this court – not an arbitrator – should decide in the first instance whether the Arbitration Clause is enforceable. With respect to the Delegation Provision, the plaintiffs primarily have argued that it would be cost-prohibitive for them to arbitrate the threshold issue of arbitrability. With respect to the Arbitration Clause more generally, the plaintiffs argue, *inter alia*, that it would be unconscionable to force them to arbitrate the merits of their claims because of cost-prohibitiveness and various other forms of procedural or substantive unconscionability.

III.    **The Record Before the Court Concerning Cost-Prohibitiveness**

In response to the Motion to Compel Arbitration, the plaintiffs originally filed a Motion to Conduct Discovery Regarding Arbitration or, in the Alternative, for a FRCP 26(f) Conference, and Motion to Hold Defendants' Motion to Compel Arbitration in Abeyance Pending Completion of Discovery Regarding Arbitration (Docket No. 41) ("Motion to Conduct Discovery"), to which the defendants filed a Response in opposition (Docket No. 43), and the plaintiffs filed a Reply (Docket No. 44).

In their Motion to Conduct Discovery, the plaintiffs sought discovery from the defendants broadly related to the issue of unconscionability, including discovery specific to the potential costs of arbitration. (*See, e.g.*, Docket No. 41, Ex. 1, proposed Interrogatories and Requests for Production, at Interrogatory No. 8; *id.*, Ex. 2, proposed Requests for Admissions, at

---

[2]The court's interpretation of the relevant terms of the Student Enrollment Agreement are set forth in more detail in the court's interim opinion regarding the Motion to Compel Arbitration. *See Dean v. Draughons Junior College*, No. 3:12-cv-157, 2012 WL 3308370 (M.D. Tenn. Aug. 13, 2012) [Docket No. 52 in this case].

4

Request No. 8.)  The defendants opposed the plaintiffs' request, arguing primarily that, under the Delegation Provision, discovery concerning arbitrability should take place before an arbitrator. In their Reply, the plaintiffs represented that they intended to oppose the Motion to Compel Arbitration on grounds specific to the Delegation Provision, thereby justifying the continuing jurisdiction of this court with respect to the issue of arbitrability pursuant to *Rent-a-Center W., Inc. v. Jackson*, — U.S. — , 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010).[3]

This court denied the Motion to Conduct Discovery and ordered the plaintiffs to respond to the Motion to Compel Arbitration.  (Docket No. 47.)  After receiving the plaintiffs' Response to that motion (Docket No. 48) and the defendants' Reply thereto (Docket No. 51), the court determined that the plaintiffs indeed had articulated a cost-prohibitiveness challenge under Kentucky law specific to the Delegation Provision, which, pursuant to *Rent-a-Center*, this court must consider.  *See Dean*, 2012 WL 3308370, at *7.  Therefore, the court ordered the parties to submit affidavits relating to the limited issue of cost-prohibitiveness and permitted the parties to submit additional Kentucky legal authority on that issue.  (*See* Docket Nos. 53 and 55.)

In response to those orders, the defendants filed the following materials:

(1)     A Notice of Supplemental Legal Authority attaching Kentucky case law (Docket No. 56);

(2)     The Declaration of Kenyon Meyer [counsel for defendants] (Docket No. 61, Attachment 1; refiled at Docket No. 65, Attachment 1); and

(3)     A second Notice of Supplemental Legal Authority (Docket No. 68) attaching an unpublished decision by the Kentucky Court of Appeals in *Daymar Colleges Grp. LLC, et al. v. Dixon, et al.*, No. 2010-CA-002039-MR (Sept. 21, 2012) [hereinafter "*Daymar*"].

---

[3]At the time, the plaintiffs had not yet filed their Response to the Motion to Compel Arbitration.

The Meyer Declaration contains, in most relevant part, (1) the defendants' estimates of potential arbitration costs, (2) representations that the defendants will front the costs of the arbitration and not seek to enforce the cost-splitting provision until the end of the arbitration; and (3) a DVD copy of an August 27, 2010 trial court evidentiary hearing in *Dixon v. Daymar Colleges Grp. LLC, et al.* 10-CI-0132 (Ky. Cir. Ct.) [hereinafter "*Dixon*"] concerning whether the Student Enrollment Agreement was unconscionable as to particular plaintiffs under Kentucky law (*see* Docket No. 67 (manual filing of DVD)).[4]

In response to the court's orders, the plaintiffs filed the following materials:

(1) a Notice of Filing attaching Kentucky case law (Docket No. 57);

(2) a Notice of Filing (Docket No. 66) and a supplemental Notice of Filing (Docket No. 73) attaching affidavits from the plaintiffs and their counsel relating to the issue of cost-prohibitiveness;[5] and

---

[4]In *Dixon*, fifteen students or former students of Daymar institutions in Kentucky (the "*Dixon* plaintiffs") sued the defendants on essentially the same grounds as asserted here. The *Dixon* plaintiffs were represented by the same counsel as the plaintiffs here. Pursuant to *Rent-a-Center*, the Kentucky trial court held a hearing concerning the enforceability of the Delegation Provision specifically and the Arbitration Clause generally. After that hearing, the trial court held that (a) it would be cost-prohibitive to force 11 of the 15 plaintiffs to arbitrate the issue of arbitrability, and (b) it would be cost-prohibitive and otherwise procedurally and/or substantively unconscionable to enforce the Arbitration Clause. Of the four remaining plaintiffs, it appears that the court compelled three to arbitrate because they failed to appear at the evidentiary hearing and compelled the fourth to arbitrate because that plaintiff's family income exceeded $100,000. (*See* Docket No. 44 at p. 4 n.4 (containing plaintiff counsel's unrebutted representation to that effect).) As discussed further herein: (1) these four plaintiffs arbitrated their claims to resolution; (2) in *Daymar*, the Kentucky Court of Appeals reversed the trial court's findings as to the other 11 plaintiffs; and (3) recently, following *Daymar*, the defendants initiated arbitration proceedings by filing individual petitions relative to each of those 11 plaintiffs. (*See* Docket No. 70.)

[5]Plaintiff Mark Parker was not able file an affidavit within the original court-ordered deadline, due to his military service. (*See* Docket No. 66.) After the court ordered Parker to file an affidavit as soon practicable and/or to justify a potential stay of proceedings (Docket No. 72), Parker timely filed the requisite affidavit (Docket No. 73, Attachment 1).

(3)     Supplemental Exhibits (Docket No. 70) showing that, in recent arbitration
        proceedings in Kentucky following *Daymar*, the defendants demanded
        $10,000 from each plaintiff for breaching the arbitration agreement.

Unless otherwise noted, the plaintiffs' individual affidavits are uncontroverted.  However, as

explained herein, plaintiffs' counsel and defendants' counsel offer differing projections of the

potential arbitration costs, both generally and as to the issue of arbitrability specifically.

Notably, the defendants, who opposed opening limited discovery on the issue of cost-

prohibitiveness in the first place, have not asked the court for any relief relative to the plaintiffs'

factual submissions.  Thus, the defendants have not asked for the opportunity to probe the

plaintiffs' factual averments, nor have they argued that the factual record concerning cost-

prohibitiveness is insufficient for purposes of ruling on the Motion to Compel Arbitration.

## APPLICABLE LAW

### I.      General Principles

As detailed in this court's previous opinion, under *Rent-a-Center v. Jackson*, the court

may consider specific challenges to the enforceability of a delegation provision.  *See Dean*, 2012

WL 3308370, at *5-*7 [Docket No. 52 at pp. 10-14].[6]  Indeed, following *Rent-a-Center*, various

federal courts have considered challenges specific to a delegation provision in an arbitration

agreement, applying defenses recognized by the body of law governing the agreement as a

whole.[7]

---

[6]The court hereby incorporates that analysis into this opinion, including the court's
previous articulation of the relevant standards under the Federal Arbitration Act ("FAA"), 9
U.S.C. § 1 *et seq.* (2012).

[7]*See, e.g.*, *Washington v. William Morris Endeavor Entm't, LLC*, No. 10 Civ.
9647(PKC)(JCF), 2011 WL 3251504, at *6-*8 (S.D.N.Y. July 20, 2011) (applying New York
unconscionability defenses); *Howard v. Rent-a-Center, Inc.*, No.1:10-CV-103, 2010 WL
3009515, at *4-*6 (E.D. Tenn. July 28, 2010) (applying Tennessee unconscionability defenses);

Once a court addresses a specific challenge to a delegation provision, the case can play out in a number of ways. If the court finds that it *is* unconscionable to force the plaintiff to arbitrate the issue of arbitrability, the court then addresses – as it would have in the absence of the delegation provision – whether there is a valid defense to enforcing the arbitration obligation. If there is such a defense, the court retains jurisdiction over the merits of the case; otherwise, the court will enforce the arbitration agreement and compel the parties to arbitrate their claims. On the other hand, if the court determines that there is *not* a valid defense to enforcement of the delegation provision, the issue of arbitrability becomes a threshold issue for the arbitrator to decide.[8]

## II.     The Plaintiffs' Unconscionability Challenge to the Delegation Provision

Here, the parties agree that, under the express terms of the Arbitration Clause, Kentucky law governs the plaintiffs' contractual defenses to enforcement of the Delegation Provision

---

*Spears v. Mid-Am. Waffles, Inc.*, No. 11-2273-CM, 2012 WL 2568157, at *2 (D. Kan. July 2, 2012) (applying Georgia unconscionability defense); *Morocho v. Carnival Corp.*, No. 10-21715-CIV., 2010 WL 5589012 (S.D. Fla. Oct. 28, 2010) (in determining whether delegation provision was unenforceable as against public policy, applying Convention on the Recognition of Foreign Arbitral Awards Act pursuant to choice of law provision in arbitration agreement). On the other hand, courts applying *Rent-a-Center* refuse to address challenges that are directed to the arbitration agreement as a whole, which they refer to the arbitrator to decide. *See, e.g.*, *Smith v. ComputerTraining.com, Inc.*, 772 F. Supp. 2d 850, 860 (E.D. Mich. 2011) (finding that issue of arbitrability was delegated to arbitrator, where plaintiffs only asserted defenses to enforcement of arbitration agreement as a whole); *SL Tenn., LLC v. Ochiai Ga., LLC*, No. 3:11-CV-340, 2011 WL 7154486 (E.D. Tenn. Dec. 8, 2011) (refusing to address issue of arbitrability, where plaintiff's fraudulent inducement defense related to contract as a whole); *Muhammad v. Advanced Servs., Inc.*, No. 09-2573-JMO/dkv, 2010 WL 3853230, at *5 (W.D. Tenn. Aug. 24, 2010) (same).

[8]In that case, the arbitrator presumably would decide at the outset of the arbitration proceedings whether the agreement to arbitrate is enforceable in the first place. If the arbitrator finds that the arbitration agreement is *not* enforceable, the plaintiff would be relieved of the obligation to arbitrate the merits of his or her claims.

specifically and the Arbitration Clause generally.[9]  The plaintiffs specifically challenge the

Delegation Clause on the basis that it would be cost-prohibitive to force the plaintiffs to arbitrate

the issue of arbitrability.  Therefore, the court must determine whether Kentucky recognizes a

cost-prohibitiveness defense and, if so, whether each plaintiff has established it.

## III.    Applicable Kentucky Law

### A.    General Kentucky Principles

Kentucky law favors arbitration as a method of dispute resolution.  *Schnuerle v. Insight*

*Commc'ns Co., L.P.*, — S.W.3d — , 2012 WL 3631378, at *10 (Ky. Aug. 23, 2012) (submitted

for publication).[10]  Indeed, "unlike most jurisdictions, arbitration enjoys the imprimatur of [the

Kentucky] state Constitution," *id.* (citing Ky. Const § 250 (2012)), and the Kentucky legislature

has statutorily recognized a policy favoring arbitration utilizing essentially the same language as

FAA § 2.  *Id.* (citing Ky. Rev. Stat. Ann. § 417.050 (West 2012)).  Accordingly, "once prima

facie evidence of [an arbitration] agreement has been presented, the burden shifts to the party

---

[9]Indeed, the plaintiffs themselves argued that Kentucky law should govern their defenses
to the Arbitration Clause and the associated Delegation Provision, and the defendants agree that
Kentucky law applies.  (*See* Docket No. 48, Pltfs. Resp. at p. 1 n.1 ("[T]his court must apply
Kentucky law" to the plaintiffs' defenses); *see also* Docket No. 54, Defs. Motion to Submit
Supplemental Kentucky Authority, at p. 1 (noting "the Court's correct conclusion that Kentucky
law (rather than federal common law) governs the plaintiff's claim that the delegation provision
is unconscionable").); *see also Stutler v. T.K. Constructors, Inc.*, 448 F.3d 343, 345 (6th Cir.
2006) (finding that, where arbitration agreement was governed by Kentucky law, trial court erred
by applying federal common law defenses to enforcement of arbitration agreement).

[10]The court has confirmed that the Kentucky Supreme Court designated the *Schnuerle*
opinion "To Be Published."  *See* http://opinions,kycourts.net/sc/2009-SC-000390-DG.pdf.  The
case dockets for the consolidated *Schnuerle* appeal and cross-appeal also confirm that the
Kentucky Supreme Court issued a final publication letter concerning that opinion and returned
the respective case records to the trial court for final disposition.  *See Schnuerle, et al. v. Insight
Commc'n's Co. L.P.*, 2008-SC-000789 (Ky.), Docket Nos. 130-31; *Insights Commc'n's Co., L.P.*,
2009-SC-000390 (Ky.), Docket Nos. 46-47.  Therefore, although only the electronic citation is
currently available, the court regards *Schnuerle* as binding Kentucky authority.

seeking to avoid the agreement," and "[t]he party seeking to avoid the arbitration agreement has a heavy burden." *Id.* (quoting *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 857 (Ky. 2004)).

In Kentucky, "absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Id.* at *11 (quoting *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001)). However, "the doctrine of unconscionability has developed as a narrow exception to this fundamental rule," subject to the following standards:

> The doctrine is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against consequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain. An unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.

*Id.* The review of arbitration clauses for unconscionability typically involves a two-step process: "first, a review focused on the procedures surrounding the making of the arbitration clause (procedural unconscionability) and second, a review of the substantive content of the arbitration clause (substantive unconscionability)." *Id.* A finding of unconscionability simply requires a finding that an arbitration agreement or provision is *either* procedurally unconscionable or substantively unconscionable – *i.e.*, it need not be both. *Id.* at *11 n.2.[11]

---

[11]Substantive unconscionability refers to contractual terms that are "unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Id.* at 12 (citing *Conseco*, 47 S.W.3d at 343 n.22)). In assessing whether a provision is substantively unconscionable, courts consider "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* (citing *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 875-76 (11th Cir. 2005)).

### B.  Availability of Cost-Prohibitiveness as a Defense

On August 23, 2012, just 10 days after this court issued its interim opinion concerning the Motion to Compel Arbitration, the Kentucky Supreme Court issued *Schnuerle*, in which it explicitly stated that Kentucky recognizes a cost-prohibitiveness defense to an arbitration provision. *See Schnuerle*, 2012 WL 3631378, at *8.

In *Schnuerle*, the plaintiffs had filed a putative class action on behalf of consumers who had entered into consumer adhesion contracts with an internet service provider. The contract contained an arbitration clause that included a class action waiver and a provision permitting consumers to pursue claims under $1,500 in small claims court. The plaintiffs argued that the class action waiver rendered the agreement unenforceable and that the agreement was otherwise procedurally and substantively unconscionable.

In an initial opinion, the Kentucky Supreme Court had held that provisions of consumer adhesion contracts that barred class action resolution of disputes were unenforceable. *See Schneurle*, 2012 WL 3631378, at *5 (discussing previous opinion). However, while the defendants' petition for rehearing of that decision was pending, the Supreme Court issued *AT&T Mobility LLC v. Concepcion*, — U.S. — , 131 S. Ct. 1740, 131 S. Ct. 1740 (2011), in which the Court held that, under the FAA, states could not condition the enforceability of arbitration agreements on the availability of classwide arbitration procedures. The Kentucky Supreme Court then reconsidered its previous decision in light of *Concepcion*:

> Because of the important purpose served by class actions, we would be inclined to join the jurisdictions . . . that have invalidated provisions of consumer contracts that bar class action resolution of disputes. Our initial opinion in this case so held. However, upon application of *Concepcion*, we are now constrained to conclude that under contracts like the one now before us, which contain a class action waiver and also require disputes to be arbitrated under the FAA, the federal

policy favoring arbitration preempts any state law or policy invalidating the class action waiver as unconscionable based solely upon the grounds that the dispute involves many *de minimis* claims which are, individually, unlikely to be litigated.

*Schneurle*, 2012 WL 3631378, at *5.

Notwithstanding *Concepcion*, the Kentucky Supreme Court affirmed that Kentucky recognizes a cost-prohibitiveness defense:

> [W]e strongly agree with Appellants that *Concepcion* does not disturb the basic principle that an arbitration clause is not enforceable if it fails to provide plaintiffs with an adequate opportunity to vindicate their claims. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985) ("[S]o long as the prospective litigant effectively may vindicate [his] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."); *Green Tree Fin. Corp.-Al. v. Randolph*, 531 U.S. 79, 81 (2000) ("the existence of large arbitration costs may well preclude a litigant . . . from effectively vindicating such rights"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009). Accordingly, arbitration clauses certainly may continue to be struck down as unconscionable if their terms strip claimants of a statutory right, which cannot be vindicated by arbitration, because, for example, the arbitration costs on the plaintiffs are prohibitively high; or the location of the arbitration is designated as a remote location. But again, simply the impracticality of pursuing a single, small dollar claim is not regarded as an impediment to vindicating one's rights.

*Id.* at *8; *see also Conseco*, 47 S.W.3d at 344 ("Should it transpire, however, that . . . [the defendant's] arbitration procedure prevent[s] or unfairly hinder[s] [the plaintiffs] from meaningfully presenting their case . . . our ruling today would not preclude the [plaintiffs] from renewing their objection to the arbitration clause in circuit court on the ground that the clause had proved unconscionable in practice. *On the record before us*, however, there is no basis for such a conclusion.") (emphasis added); *Stutler*, 448 F.3d at 347 (Moore, J., concurring in the judgment) (stating that "*Conseco* le[ft] the door open to the possibility of recognizing a cost-related claim of unconscionability.")

With respect to the "impracticality" of vindicating the plaintiff's rights, the Kentucky

Supreme Court was persuaded that the exception for small claims in the arbitration clause at issue provided the plaintiffs with a means of receiving full redress for their injuries:

> [I]t would be inaccurate to conclude that the consumers in this case cannot adequately vindicate their rights as contemplated in *Mitsubishi* for the reason that the arbitration clause in this case specifically reserves for Insight customers the same avenue of recovery available to any other plaintiff with a $40.00 claim, that is, the right to go to small claims court. The cost of going to small claims [court] is a $20 filing fee . . . plus the cost of service of process, all of which would be recoverable as part of the successful small claims judgment. And while most, if not all, consumers may well choose to forgo recovery because it is just not worth the trouble, by the Supreme Court's calculus in *Concepcion*, it is preferable for the public to suffer the unjust enrichments that defendants may occasionally gain than to burden the arbitration process favored by federal law . . . .

2012 WL 3631378, at *9. Accordingly, the court held that the class action waiver in the consumer services adhesion contract at issue was enforceable. *Id.*

The court then rejected the plaintiffs' remaining procedural and substantive unconscionability arguments, including the argument that, pursuant to the *Conseco* standard, the agreement was substantively unconscionable because it forced the plaintiffs to arbitrate low-value claims for which no counsel would take the case. *See id.* at *12. For essentially the same reasons it articulated with respect to the class action waiver issue, the court was unpersuaded on the issue of cost-prohibitiveness: "[F]or the *de minimis* individual claims of this case, the customer is deprived of no right at all by the arbitration clause. *With or without the arbitration clause*, he is free to take his cause of action to small claims court, which would be the normal forum in Kentucky's court system for the individual's claim to be filed in any event." *Id.* (emphasis added).

In sum, in *Schneurle*, the Kentucky Supreme Court recognized that it is a "basic principle" that an arbitration clause is unconscionable if the costs to a plaintiff of arbitrating are

"prohibitively high." *Id.* at *8. In applying that principle, the court found that, where an

individual plaintiff possesses only a *de minimis* claim and retains the right to pursue that claim in

small claims court – the same procedure that would have been available even in the absence of

an arbitration agreement – an arbitration clause is not substantively unconscionable.[12]

Accordingly, this court must analyze whether the plaintiffs have established the cost-

prohibitiveness defense recognized in *Schnuerle*. This requires determining the potential costs

of arbitration proceedings on the issue of arbitrability and each plaintiff's ability to pay those

---

[12]On September 21, 2012, one month after the Kentucky Supreme Court issued *Schnuerle*, the Kentucky Court of Appeals issued its unpublished *Daymar* opinion, in which a majority of the three-judge panel overturned the *Dixon* trial court's findings that the Delegation Provision and the Arbitration Clause were both unenforceable as to 11 of the 15 plaintiffs. The *Daymar* court found, without reference to *Schneurle*, that Kentucky law does not recognize a cost-prohibitiveness defense under any circumstances. The court also found that the Arbitration Clause as a whole was not procedurally or substantively unconscionable.

With respect to the issue of cost-prohibitiveness, *Daymar* is of no precedential weight for multiple reasons. First, this court is of course obligated to follow decisions by the Kentucky Supreme Court on an issue – here, *Schnuerle* – rather than an unpublished lower appellate court opinion to the contrary. *See Clutter v. Johns-Manville Sales Corp.*, 646 F.2d 1151, 1153 (6th Cir. 1981) ("[A] federal court sitting in diversity must apply the law of the state's highest court"); *see also* Ky. R. Civ. P. 76.28(4)(c) (2012) (unpublished Kentucky appellate court decisions "shall not be cited or used as binding precedent in any other case in any court of this state," except that unpublished Kentucky appellate decisions issued after January 1, 2003 "may be cited for consideration *if there is no published opinion that would adequately address the issue* before the court") (emphasis added). Second, even without regard to *Schnuerle*, the *Daymar* decision contains several serious methodological flaws, including, *inter alia*, its overly narrow reading of *Conseco* and its patent misinterpretation of the Sixth Circuit holding in *Stutler*, which did not even address whether Kentucky recognizes a cost-prohibitiveness defense. *See Conseco*, 47 S.W.3d at 348; *Stutler*, 448 F.3d at 347.

Finally, it is worth noting that, once the *Daymar* majority determined (albeit incorrectly) that Kentucky law did not recognize the plaintiffs' cost-prohibitiveness defense to the Delegation Provision under any circumstances, it appears that the court should *not* have addressed whether the Arbitration Clause and/or the Student Enrollment Agreement as a whole was enforceable. That is, having determined that the Delegation Provision was enforceable, the court, pursuant to *Rent-a-Center*, should have left the issue of arbitrability for the arbitrator to decide.

costs.

## ANALYSIS

I.    **Potential Costs of Arbitrating the Issue of Arbitrability**

    A.    ***Dixon* Proceedings and the Kentucky Arbitration Proceedings**

With respect to the potential costs of arbitration, both sides rely in part on facts relating to the resolution of substantially identical claims by Daymar students in Kentucky. In *Dixon*, the trial court conducted an evidentiary hearing regarding the issue of unconscionability with respect to the same Student Enrollment Agreement that is at issue in this case. An expert for the plaintiffs testified that, among other things, it would likely take an arbitrator one day to conduct an evidentiary hearing on the specific issue of arbitrability. Daymar's counsel also represented to the Kentucky trial court that Daymar would front the fees associated with arbitrating the plaintiffs' claims. Following this hearing, the trial court held that it would be unconscionable to compel 11 of the 15 plaintiffs to arbitrate their claims.

Accordingly, the remaining four plaintiffs participated in an arbitration in Kentucky against Daymar ("First Set of Kentucky Arbitration Proceedings"). The parties initially were given a list of arbitrators from which to choose, whose rates ranged from $175 to $300 per hour. Ultimately, the First Set of Kentucky Arbitration Proceedings took place before an arbitrator who charged $150 per hour for non-hearing time and $1,500 per day of hearing.[13] Although the defendants had represented to the *Dixon* court that they would front the costs of the arbitration,

---

[13]Although the arbitration took place in Kentucky, the arbitrator was a Nashville-based attorney licensed in Tennessee. It appears that this arbitrator and the other arbitrators whom the parties considered charge the same hourly rates for arbitrations in Tennessee and Kentucky. Also, plaintiffs' counsel avers that, in his experience, the $150 rate was lower than the typical hourly rate for an arbitrator.

the defendants did not do so.[14]  Furthermore, the defendants attempted to make each plaintiff

arbitrate her claims separately from the other plaintiffs – a request that the arbitrator denied.

Notably, although the plaintiffs asked the arbitrator to address the threshold question of whether

the Delegation Provision was enforceable, the arbitrator instead conducted a full four-day

hearing on the merits of the dispute and held, after the close of proof, that it was not necessary

for him to decide the issue of arbitrability.  Also, after the close of proof but before the arbitrator

had rendered a decision on the merits of the plaintiffs' claims, Daymar asked the arbitrator to

order the plaintiffs to pay *all* the costs of the arbitration, notwithstanding the fee-splitting

provision.  The arbitrator ultimately enforced the fee-splitting provision and the plaintiffs

collectively paid $11,864.28 in fees – or approximately $3,000 per plaintiff.

Also, after the *Daymar* court reversed the *Dixon* decision with respect to the remaining

11 *Dixon* plaintiffs, the defendants apparently filed individual arbitration demands with respect

to each of those plaintiffs pursuant to the AAA Supplementary Procedures for Consumer-Related

Disputes (collectively, "Second Set of Kentucky Arbitration Proceedings").  Notably, in each of

those filings, the defendants demand $10,000 from each plaintiff for breach of contract, claiming

that each plaintiff breached the arbitration clause in the Student Enrollment Agreement by filing

the *Dixon* lawsuit.  (*See, e.g.*, Docket No. 1, Attachment 1, at pp. 1-2 (demand as to plaintiff

Amy Lee).)

**B.      Potential Costs to Arbitrate the Issue of Arbitrability**

1.      Time Required by an Arbitrator to Address Arbitrability

---

[14]Indeed, in the *Dixon* trial court order summarily confirming the arbitrator's award, the court ordered the defendants to pay a balance of $2,024 back to the plaintiffs, reflecting "the portion of fees and expenses in excess of *the apportioned costs previously incurred by the plaintiffs*."  (Docket No. 51, Ex. 2 (*Dixon* Order dated July 20, 2012) (emphasis added).)

Here, with respect to the issue of arbitrability specifically, the defendants argue that, as the plaintiffs' expert in *Dixon* testified, an arbitrator would need to conduct a one-day hearing on the issue of arbitrability. The plaintiffs have offered no evidence to the contrary and do not appear to contest this representation.

In addition to conducting a hearing on arbitrability, an arbitrator would also need to spend some amount of time analyzing the legal issues presented before the hearing and to render a written decision following it. The parties here have not stated how much out-of-hearing time the arbitrator would likely spend on this issue. Nevertheless, the court expects that the parties would make written submissions to the arbitrator, which, if those submissions even approach the level of detail and sophistication of the parties' briefs to this court, would require at least four hours combined to consider, at an absolute minimum. Furthermore, because the plaintiffs have asserted a host of challenges to the enforceability of the Arbitration Clause, some of which require a plaintiff-by-plaintiff inquiry for each of the eight plaintiffs, the court expects that a reasonable arbitrator would need at least an additional four hours to consider the application of relevant law to the evidence presented and to render a written decision.[15]

Therefore, in assessing the potential costs of arbitrating arbitrability, the court makes the following conservative baseline assumptions: (1) an arbitrator would conduct a one-day hearing on the issue of arbitrability; (2) the arbitrator would charge at least $1,500 for that hearing; (3) the arbitrator would spend at least eight non-hearing hours on the issue; and (4) the arbitrator would charge between $150 and $300 per hour for non-hearing time.

---

[15]Moreover, it is conceivable that, as occurred here, the parties would dispute whether pre-hearing discovery would be necessary. Such a dispute could require the arbitrator to spend additional time on the case.

2. <u>Traditional Commercial Arbitration</u>

(a)     General Rules

The AAA Commercial Rules and Mediation Procedures ("Commercial Rules") set forth the fee structure for traditional commercial arbitration proceedings. (*See* Docket No. 56, Ex. 4, Commercial Rules.) The default Commercial Rules are that (1) the party demanding arbitration must pay an Initial Filing Fee (*id.*, R-49); (2) the expenses of the arbitration, "including required travel and other expenses of the arbitrator, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties," unless the parties agree otherwise or the arbitrator assesses expenses in the award (*id.*, R-50); (3) the arbitrators are compensated at a rate consistent with the arbitrator's stated rate of compensation (*id.*, R-51); and (4) if a hearing is conducted, the parties must pay a Final Fee (Commercial Rules at p. 53). Notwithstanding the default rules, the arbitrator retains discretion to apportion fees, expenses, and compensation among the parties "in such amounts as the arbitrator deems appropriate." (*Id.*, R-43(c)).[16]

With respect to filing fees, the Commercial Rules include a Standard Fee Schedule, which sets forth a sliding scale of fees for monetary claims (varying based on the "Amount of Claim") and a flat fee for "Nonmonetary claims." (*See* Commercial Rules at p. 54.)[17]

---

[16]Also, "[t]he AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." (*Id.*, R-49).

[17]The Commercial Rules also include a "Flexible Fee Schedule," which requires a lower Initial Filing Fee, a non-refundable "Proceed Fee" to proceed with selection of an arbitrator and resolution of the case, and a Final Fee to be paid after a hearing is conducted. It appears that, in return for lowering the Initial Filing Fee, the total fees (*i.e.*, initial filing fee + proceed fee + final fee) are higher than they would be for an equivalent arbitration under the Standard Fee Schedule. Perhaps for this reason, neither party has referenced the Flexible Fee Schedule as a potential option here.

(b)     Nonmonetary Arbitration

Filing for an arbitration proceeding specific to the issue of arbitrability would constitute a "nonmonetary" arbitration that requires a $3,350 Initial Filing fee, a $1,250 Final Fee, and payment of the arbitrator's expenses.  Under the court's conservative rate and hour assumptions, and assuming that a single arbitrator conducts the arbitration and all eight named plaintiffs participate, the total costs would be as follows:

1. <u>At $150 per hour</u>: $3,350 Initial Filing Fee + $1,250 Final Fee + $1,500 for hearing + $1,200 in arbitrator's fees = $7,300.
   a. Per Plaintiff Cost if Proceeding Individually: **$3,650**
   b. Per Plaintiff Cost if Proceeding Collectively: **$456.25**

2. <u>At $300 per hour</u>: $3,350 Initial Filing Fee + $1,250 Final Fee + $1,500 for hearing + $2,400 in arbitrator's fees = $8,500
   a. Per Plaintiff Cost if Proceeding Individually: **$4,250**
   b. Per Plaintiff Cost if Proceeding Collectively: **$531.25**

Thus, under this approach, the projected costs per plaintiff range from $456 to $4,250.[18]

(c)     Monetary Arbitration

Practically, the parties may file for an arbitration that addresses *both* the arbitrability issue and, if necessary, the merits of the plaintiffs' claims – mirroring the approach the parties

---

[18]Of course, to the extent that fewer than eight plaintiffs proceed collectively, the per-plaintiff costs would be significantly greater than the baseline amounts of $456.25 or $531.25 indicated here.  This complicates the court's analysis somewhat.  For example, assume that six of the eight plaintiffs could not afford to pay $456.25 to arbitrate arbitrability, while the other two plaintiffs could afford to pay up to approximately $1,000 before the financial burden became too severe.  If the court were to force only those two individuals to arbitrate the issue of arbitrability in a non-monetary arbitration under otherwise identical assumptions, the costs to those two plaintiffs would be either *$1,825* or *$2,225*, respectively – well beyond their ability to pay in either case.  Thus, the baseline "collective" proceeding cost calculation is truly a "best-case" scenario that assumes all eight plaintiffs could pay that amount; to the extent that any plaintiff or plaintiffs cannot even pay that baseline amount, the financial burden on the remaining plaintiffs to proceed collectively would increase, perhaps significantly.  The same consideration applies to the court's other per-plaintiff "collective" calculations set forth herein.

took in the First Set of Kentucky Arbitration Proceedings. Therefore, the arbitration filing would constitute a monetary claim subject to the Standard Fee Schedule. The costs to reach the issue of arbitrability under such a filing would at least vary based on: (1) whether the plaintiffs are permitted to proceed collectively or are forced to proceed individually; (2) the value of the claims asserted (whether valued as the demand by (a) the eight named plaintiffs collectively, (b) the class, or (c) each plaintiff individually); and (3) the arbitrator's rate. Depending upon these factors, the possible outcomes are as follows:

1. Collective Action & $150,000-$300,000 in aggregated damages:[19] $2,800 Initial Filing Fee + $1,250 Final Fee + $1,500 for hearing + arbitrator fees:
   a. Cost per Plaintiff @$150/hour = **$422**
   b. Cost per Plaintiff @$300/hour = **$497**

2. Collective Action & $300,000-$500,000 in aggregated damages = $4,350 Initial Filing Fee + $1,750 Final Fee + $1,500 for hearing + arbitrator fees:
   a. Cost per Plaintiff @$150/hour: **$550**
   b. Cost per Plaintiff @$300/hour: **$625**

3. Class Action & $10,000,000 compensatory damages demand[20] = $12,800 Initial Filing Fee + $6,000 Final Fee + $1,500 for hearing + arbitrator fees:
   a. Cost per Plaintiff @$150/hour: **$1,343.75**
   b. Cost per Plaintiff @$300/hour: **$1,418.75**

4. Individual Action valued at less than $10,000: $775 Initial Filing Fee + $200 Final Fee + $1,500 for hearing + arbitrator's fees:
   c. Cost per Plaintiff @$150/hour: **$1,837.50**

---

[19]As described herein, the plaintiffs collectively spent and/or owe in loans a total of $200,000 with respect to their Daymar education. The plaintiffs also seek compensation for, *inter alia*, their pain and suffering and lost income opportunities.

[20]The plaintiffs here have demanded $25,000,000 in compensatory *and* punitive damages on behalf of the class. For purposes of this analysis, the court will assume that the plaintiffs seek approximately $10,000,000 in compensatory damages. For compensatory damages demands above or below $10,000,000, the filing fees vary somewhat. *See* Commercial Rules at p. 54. Also, arbitrations involving a claim over $500,000 may be governed by the AAA Procedures for Large, Complex Commercial Disputes, which can implicate increased costs for a panel of arbitrators and a mandatory preliminary hearing. (*See* Commercial Rules at p. 11, L-2, and L-3.)

        d.      Cost per Plaintiff @$300/hour: **$2,437.50**

5.      Individual Action valued between $10,000 and $75,000: $975 Initial Filing Fee + $300 Final Fee + $1,500 for hearing + arbitrator's fees:
        e.      Cost per Plaintiff @$150/hour: **$1,987.50**
        f.      Cost per Plaintiff @$300/hour: **$2,587.50**

6.      Individual Action valued between $75,000 and $150,000: $1,850 Initial Filing Fee + $750 Final Fee + $1,500 for hearing + arbitrator's fees
        g.      Cost per Plaintiff @$150/hour: **$2,650**
        h.      Cost per Plaintiff @$300/hour: **$3,250**

Thus, even assuming that arbitrating the issue of arbitrability involves no other costs, such as arbitrator fees to resolve a discovery dispute or arbitrator travel expenses, it could cost each plaintiff between $422 and $3,250 to get a decision on the issue of arbitrability under the traditional Commercial Rules.

3        Consumer Supplementary Procedures

The AAA Commercial Rules also contain a set of supplemental procedures entitled the "Consumer-Related Disputes Supplementary Procedures" (hereinafter "Consumer Supplementary Procedures"), which the defendants argue provide another potential means for reducing the plaintiffs' out-of-pocket arbitration costs. The Consumer Supplementary Procedures are designed to address disputes relating to any of the "[m]illions of consumer purchases [that] take place each year." *See* Consumer Supplementary Procedures, at p. 2 [Ex. E to Meyer Decl.]. Thus:

> The AAA applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its [sic] terms, conditions, features, or choices. The product or service must be for personal or household use.

*Id.* Notably, "*the AAA will have discretion* to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator." *Id.* (emphasis added).

For arbitrations conducted pursuant to the Consumer Supplementary Procedures, certain costs are capped, based on the value of a claim and any counterclaim thereto, as follows:

1.  Claim Between $10,000 and $75,000: The arbitrator receives $750 per day of in-person hearings or $250 for a telephone hearing (or no hearing), and the consumer's share of the costs is capped at $375. The arbitrator conducts a hearing unless the parties agree not to have one.[21]

2.  Claim Over $75,000: The parties pay the arbitrator pursuant to the Commercial Fee Schedule, the consumer must deposit one-half of the arbitrator's compensation, and the arbitrator is compensated at the rate set forth on the arbitrator's panel biography.

The arbitrator must render a decision within 14 days of a hearing or, if no hearing is conducted, within 14 days of receipt of the final written submissions. The Consumer Supplementary Procedures appear to relate only to individual claims; they make no reference to aggregated claims. (*See, e.g.*, C-8 ("If the consumer's *claim* or *counterclaim* does not exceed $10,000 . . .") (emphases added)).

C.    **Likely Outcomes and Associated Costs Per Plaintiff**

---

[21]For claims under $10,000, the plaintiffs' share of the costs is capped at $125. As described herein, the defendants have put forth evidence that plaintiffs Amber Gilchrist and Mark Parker paid only about $8,000 for their Daymar education, which the defendants suggest constitutes the full value of Gilchrist's and Parker's compensatory damages demand. However, Gilchrist and Parker also seek other forms of compensatory damages, including pain and suffering and lost income opportunities – *i.e.*, damages over and above the actual amounts that they paid to Daymar. Thus, although the defendants appear to treat the value of Gilchrist's and Parker's claims as capped at the $8,000 expense amounts, the Complaint allegations establish otherwise. Accordingly, the court presumes that, after factoring in the multiple forms of compensatory recovery sought, Gilchrist and Parker individually demand more than $10,000 each in compensatory damages.

As detailed in the previous section, under conservative assumptions, the plaintiffs' out-of-pocket costs to arbitrate arbitrability conceivably could range from about $375 to $4,250, depending on the nature of the proceedings and the rates charged. The defendants argue that the court should presume that the plaintiffs' out-of-pocket costs to arbitrate arbitrability would almost certainly be at the low end of this spectrum. Particularly based on the defendants' actual conduct in the Kentucky Arbitration Proceedings, the court is not persuaded.

1.     Application of the Consumer Supplementary Procedures

The lowest possible outcome of $375 per plaintiff depends on at least three conditions: (1) the plaintiffs arbitrate under the Consumer Supplementary Procedures; (2) they do so individually; and (3) their claims are individually worth less than $75,000.

As an initial matter, it is not self-evident that a Daymar education constitutes a "consumable service" for "personal or household use" subject to those procedures.[22]  More importantly, although the defendants continue to seek to force potential plaintiffs to arbitrate individually, the plaintiffs here (and at least in the First Set of Kentucky Arbitration Proceedings) have sought to proceed *collectively*, on behalf of themselves and/or on behalf of a putative class seeking a multi-million dollar damages award.  If the AAA were to permit the plaintiffs to pursue collective relief, the AAA could view the abbreviated proceedings contemplated by the Consumer Supplementary Procedures as ill-suited for the level of sophistication, case management, and hearing time that would be required to resolve the

_____

[22]With respect to the 11 plaintiffs in the Second Set of Kentucky Arbitration Proceedings, the defendants apparently filed 11 separate petitions under the Consumer Supplementary Procedures.  Based on the record before the court, it is unclear whether the defendants did so either (1) unilaterally, (2) with each plaintiff's consent, and/or (3) with the blessing of the AAA that those procedures apply.  Thus, it is not clear whether the AAA has determined that those procedures apply to the claims at issue and/or whether the plaintiffs dispute their application.

plaintiffs' claims on the merits. Under these circumstances, the court cannot assume that the AAA *in its discretion* would actually apply the Consumer Supplementary Procedures instead of the traditional rules – and there are plausible grounds why it might not. Indeed, with respect to the initial four plaintiffs referred to arbitration in the Kentucky Arbitration Proceedings, the arbitration appears to have taken place under the traditional Commercial Rules, *not* the Consumer Supplementary Procedures.

Furthermore, even if the Consumer Supplementary Procedures did apply, the plaintiffs could face significant additional costs. First, to the extent any plaintiff seeks more than $75,000 in compensatory damages, or if the plaintiffs were (surprisingly) permitted to arbitrate collectively under those procedures, the parties would have to pay the arbitrator's normal rates, driving up the costs significantly. Second, following *Daymar*, the defendants demanded *$10,000* from each plaintiff, claiming that each plaintiff breached the Arbitration Clause by filing the *Dixon* lawsuit in the first place. The defendants have not represented to this court that, if they were to file similar petitions pursuant to the Consumer Supplementary Procedures with respect to the plaintiffs in this case, they would not pursue the same tactics to drive up the potential costs for each plaintiff.

2.      Application of Traditional Commercial Rules

If the plaintiffs arbitrate under the traditional Commercial Rules, which seems highly plausible if the arbitration initially proceeds collectively, the arbitration costs to reach the issue of arbitrability would be much higher. The eight named plaintiffs likely seek above $300,000 in compensatory damages (*i.e.*, more than the $200,000 they collectively paid to Daymar). Thus, if the plaintiffs arbitrate collectively under the Commercial Rules, the per-plaintiff costs to reach

the issue of arbitrability would range from about $550-$625. On the other hand, if the plaintiffs are forced to arbitrate individually, the per-plaintiff costs to Gilchrist and Parker would likely range at least from $1,800 to $2,400, while the per-plaintiff costs to the remaining plaintiffs would range at least from $2,000 to $2,600 for claims valued under $75,000 and from $2,650 to $3,250 for claims valued above $75,000.

Although these competing scenarios depend, to some extent, on factors that are not easy to predict, past is prologue. The First Set of Kentucky Arbitration Proceedings in fact took place under the traditional Commercial Rules as a collective action by four of the *Dixon* plaintiffs. With respect to those proceedings, the defendants (1) misrepresented to a Kentucky court they would front the costs of the arbitration – which they did not; (2) unsuccessfully sought to force each plaintiff to proceed individually – which would have driven up the individual costs to each plaintiff significantly; (3) asked the arbitrator to force the plaintiffs to pay *all* of the arbitration expenses – which would have been approximately $6,000 per plaintiff, and (4) ultimately permitted the arbitrator to enforce the fee-splitting provision – which resulted in those plaintiffs paying approximately $3,000 each. Despite these substantial out-of-pocket payments, the plaintiffs did not even receive a ruling on the threshold issue of arbitrability. Similarly, in the Second Set of Kentucky Arbitration Proceedings, the defendants have filed individual arbitration demands that include a $10,000 claim against each plaintiff simply for filing the *Dixon* lawsuit.

It appears to the court that the defendants have in fact been pursuing a "divide and conquer" approach designed to drive up the arbitration costs to potential plaintiffs as high as possible, while at the same time urging this court to assume "best-case" scenarios that are inconsistent with the defendants' actual conduct. Indeed, the defendants have not foreclosed

themselves from engaging in the same tactics here.  Accordingly, the court finds it highly

plausible that, to arbitrate arbitrability, Gilchrist and Parker will need to spend at least $1,800 to

$2,400 and that the remaining plaintiffs will need to spend at least $2,000 to $2,600.  The court

also finds that, even under a plausible "best case" scenario, the plaintiffs would need to pay

between approximately $550 and $625 to arbitrate the issue of arbitrability collectively under the

Commercial Rules.

## II.    <u>Each Plaintiff's Financial Circumstances</u>

### A.    **Common Averments**

The plaintiffs, across their affidavits, aver the following common uncontroverted facts:

- When they signed the Student Enrollment Agreements, the plaintiffs did not understand the Arbitration Clause, were not aware of it, and did not know what arbitration was.  No one from Daymar explained the Arbitration Clause to them, and none of the plaintiffs was even aware that the Agreements contained a back page.

- The plaintiffs were not aware of the Delegation Provision and no one at Daymar attempted to explain what it meant.  Thus, when the plaintiffs signed the Agreements, they were unaware that they were possibly agreeing to allow an arbitrator to resolve the issue of arbitrability, let alone to resolve the merits of potential claims against Daymar.

- None of the plaintiffs knows (or knew) what the AAA is or what its rules are, and no one from Daymar ever showed them or explained to them the AAA provisions referenced in the Arbitration Clause.

- None of the plaintiffs has experience with contracts, arbitration provisions, or delegation provisions.  None of them consulted with an attorney before signing the Agreements.

- The plaintiffs felt pressure from Daymar representatives to quickly sign the Agreements.

Also, with respect to the claims asserted in this case, each of the plaintiffs retained their

current counsel through individual contingency fee agreements.  Under those contingency fee

agreements, plaintiffs' counsel has not agreed to pay, let alone front, the costs of arbitrating the plaintiffs' claims. Therefore, the plaintiffs themselves – not their attorneys – would be responsible for paying all of their own arbitration costs.[23]

## B.   Melanie Hickman

Hickman earned a graduate equivalency degree ("GED"), after which she enrolled in Daymar and graduated with a degree in Paralegal Studies. She is currently unemployed. She alleges that she has been unable to find employment as a paralegal because her degree from Daymar is not recognized. In the last taxable year, Hickman had no income. She does not have a checking account or any liquid assets. She is married and has a dependent child. As the court construes Hickman's affidavit, her family owns a home, but has no equity in that home because its current value is less than the mortgage balance.[24] Hickman borrowed more than $40,000 to attend Daymar and currently owes $40,000 on those loans. Hickman avers that (1) she cannot afford to arbitrate the issue of arbitrability; and (2) if she is forced to pay the costs of arbitration, she cannot afford to pursue her claim.

## C.   Alannah Wilson

---

[23]In support of the defendants' position, defendants' counsel Kenyon Meyer declares that "[i]t cannot be true that the Plaintiffs and/or their lawyers have the resources to bring a class action on behalf of so many individuals that 'joinder of all members is impractical,', and yet simultaneously are unable to afford half the cost of arbitration." (Meyer Decl. ¶ 7.) Aside from the problem that this declaration statement is actually argument, not fact, the nature of the plaintiffs' contingency fee arrangement refutes this contention. Indeed, as plaintiffs' counsel argued to the trial court in *Dixon*, there are valid financial reasons why a law firm would agree to front the costs of litigation but not the costs of arbitration. (*See* Docket No. 67, DVD of *Dixon* 8/27/10 Evidentiary Hearing, Video 1, at 18:45-20:30).

[24]Hickman's affidavit states that her "family mortgages a home but we have no equity in that home because its current value is less than what we paid for it." (*See* Docket No. 66, Attachment No. 8, at ¶ 8.) The court presumes that what Hickman means to say is that she has no equity in the home because her mortgage balance exceeds the home's current market value.

Wilson graduated from high school, after which she studied Criminal Justice at Daymar but did not graduate. She currently works part-time as a babysitter, earning $400 every two weeks (which extrapolates to $10,400 per year). In the last taxable year, she was unemployed and had no income. She currently has $40 in cash and no other liquid assets. She does not own a home or a car. She borrowed more than $40,000 to attend Daymar and currently owes $40,000 on those loans. Wilson avers that (1) she cannot afford to arbitrate the issue of arbitrability; and (2) if she is forced to pay the costs of arbitration, she cannot afford to pursue her claim.

### D.    Latricia McGee

McGee graduated from high school, studied Medical Assisting at Daymar, and earned a degree. She has never found work in her field of study and is currently unemployed. In the last taxable year, she worked four months of temporary employment as an unskilled laborer in a field unrelated to her field of study. She has no money in her checking account and no other liquid assets. She is single and has a dependent child. She pays $819 per month on a house in arrears, which she will possibly lose to foreclosure. She borrowed more than $17,000 to attend Daymar and currently owes $17,000 on those loans. McGee avers that (1) she cannot afford to arbitrate the issue of arbitrability; and (2) if she is forced to pay the costs of arbitration, she cannot afford to pursue her claim.

### E.    Amber Gilchrist

Gilchrist studied Dental Assisting at Daymar. She currently works as an unskilled laborer in a field outside her field of study, making $8.75 per hour. In the last taxable year, she earned no income. She has three dependent children, and her husband recently left the military. She and her husband have $20 in a checking account and no other liquid assets. She rents her

home and leases her vehicle. Gilchrist borrowed at least $8,000 to attend Daymar and currently owes at least $8,000 on those loans.[25] Gilchrist avers that (1) she cannot afford to arbitrate the issue of arbitrability; and (2) if she is forced to pay the costs of arbitration, she cannot afford to pursue her claim.

### F.    Curtis Wardwell

Wardwell earned a military GED, studied Network Administration at Daymar, and earned two degrees from Daymar. He currently works as a special education assistant in a field outside of his field of study, in which he earns $13.25 per hour. In the last taxable year, he earned $17,000. He has a checking account for paying his bills but has no other liquid assets.

Wardwell's wife has been diagnosed with cancer, but he and his wife have only marginal health insurance with a high deductible. Wardwell cares for a relative's child, who is dependent on Wardwell, and with respect to whom Wardwell receives no child support. Wardwell does not own a home or a vehicle outright. He pays $300 per month on a "rent-to-own" plan on a mobile home, he pays $250 per month for the mobile home's lot and water bills, and he owes $4,000 on a pickup truck, with respect to which he pays $255 per month – which extrapolates to about $9,600 per year in monthly expenses. Wardwell borrowed more than $48,500 to attend Daymar and currently owes $48,500 on those loans. Unless his loans are deferred, he will start monthly payments soon. Wardwell avers that (1) he cannot afford to arbitrate the issue of arbitrability; and (2) if he is forced to pay the costs of arbitration, he cannot afford to pursue his claim.

---

[25]Gilchrist avers that she borrowed (and currently owes) approximately $10,000 in loans. However, the defendants have produced evidence that she actually spent only about $8,000 on tuition, books, and other expenses at Daymar. (Meyer Decl., Ex. F [Docket No. 65, Attachment 7].) For purposes of the pending motion only, the court will assume that Gilchrist only took out a loan corresponding to these expenses.

### G.      Elizabeth Dean

Dean earned a GED, studied Medical Assisting at Daymar, and earned a degree.  She currently works as a delivery driver in a field outside her field of study.  In the last taxable year, she earned $36,000.  She is the sole provider for her family, including a husband who is fully and permanently disabled.  She and her husband have approximately $400 in their checking account and no other liquid assets.  She pays over $800 per month on her home and $233 per month for her auto loan.  Dean borrowed more than $20,000 to attend Daymar and currently owes approximately $20,000 on those loans.  She currently pays $208 per month on those loans, and this amount will increase to $497 per month (at an unspecified time).  Thus, she is paying approximately $15,000 per year in home, auto, and educational loan payments combined, an amount that will increase to approximately $18,000 per year when her educational loan payments increase.  Dean avers that (1) she cannot afford to arbitrate the issue of arbitrability; and (2) if she is forced to pay the costs of arbitration, she cannot afford to pursue her claim.

### H.      Maria Ward

Ward earned a GED, studied Billing and Coding at Daymar, and earned a degree.  She currently works as an unskilled laborer in a field unrelated to her field of study, in which she earns $10 per hour and typically works 40 hours per work.  In the last taxable year, she earned $34,000 after a previous employer approved approximately 900 hours of overtime.  That amount of overtime was unusual.  She does not own a home.  She pays $900 per month in rent and $329 a month on a vehicle that she drives to work.  She borrowed more than $21,000 to attend Daymar and currently owes about $21,000 on those loans, with respect to which she is currently paying approximately $238 per month.  Thus, she pays approximately $17,600 per year in

combined rent, vehicle, and loan payments.  Ward avers that (1) she cannot afford to arbitrate the issue of arbitrability; and (2) if she is forced to pay the costs of arbitration, she cannot afford to pursue her claim.

## I.      Mark Parker

Parker graduated from high school and attended Daymar.[26]  In the last taxable year, he earned $26,000 from the National Guard.  He appears to make approximately $1,200 per month in wages as a help desk operator, almost all of which he spends on monthly bills on behalf of his family, including a wife and two dependent children for whom he is the sole provider.  He has a checking account that he uses to pay his bills (including rent and vehicle lease payments) and no other liquid assets.  He does not own a home or a car.  Parker spent at least $8,000 to attend Daymar.[27]

## III.    Cost-Prohibitiveness

The plaintiffs manifestly do not possess the resources to pay an arbitrator to arbitrate the issue of arbitrability.  Hickman has no income, no liquid assets, no real property interests she can leverage to finance an arbitration, a dependent child, and $40,000 in educational loans.  Wilson had no income last year, currently makes negligible income as a part-time babysitter, has just $40 in cash, no other liquid assets, no equity interests to leverage, and owes $40,000 in educational loans.  McGee is unemployed, has no liquid assets, no equity interests to leverage

---

[26]Parker does not state what field of study he pursued at Daymar or whether he graduated.

[27]Unlike the affidavits filed by the other plaintiffs, Parker's affidavit does not state the value of any educational loans he took out or what balance, if any, remains unpaid.  However, the Kenyon Declaration contains materials establishing that Parker spent just under $8,000 in tuition, fees, and books at Daymar, which the defendants represent may constitute Parker's actual damages.  (*See* Kenyon Decl. at p. 4 n.2.)

(and may lose her home to foreclosure), is single, has a dependent child, and owes $17,000 in educational loans.  Gilchrist had no income last year, has only $20 in her bank account, has no other liquid assets, has no equity interests to leverage, and owes at least $8,000 in educational loans.  Although Wardwell earned $17,000 last year, he spends approximately $10,000 per year in living expenses, cares for a wife who was recently diagnosed with breast cancer and who possesses only marginal health insurance to cover treatment, cares for a relative's dependent child for which he receives no child support, and owes $48,500 in educational loans.  Although Dean earned $36,000 last year, she pays approximately $15,000 per year on home and loan payments, has only $400 in her bank account, possesses no other liquid assets, is the sole provider for her family, cares for a fully and permanently disabled husband, and owes $20,000 in educational loans.  Similarly, although Ward earned $34,000 last year, that was an unexpected windfall from back pay she was owed, she currently makes only about $20,000 per year in an unskilled wage position, and she pays approximately $17,600 per year in rent and loan payments – *i.e.*, substantially all of her gross income going forward.  Parker makes only about $1,200 per month, nearly all of which he spends on monthly living expenses for his family, including two dependent children, and he does not have any disposable liquid assets.

As these circumstances demonstrate, the plaintiffs are not only close to destitute, but also (except perhaps as to Parker) burdened with crippling educational debt obligations – both of which they attribute to the defendants' past misrepresentations.  Gilchrist and Wardwell do not have the resources to pay between $550 and $2,400 to arbitrate arbitrability; similarly, the remaining plaintiffs do not have the resources to pay between $550 and $3,350 to arbitrate

arbitrability.[28]  Their inability to pay is even more acute at the higher end of these ranges.  In light of these circumstances, the court credits the plaintiffs' otherwise unrebutted representations that they cannot afford to arbitrate the issue of arbitrability.

The defendants argue that, even if the plaintiffs could not otherwise afford to pay an arbitrator with respect to the issue of arbitrability, the defendants' promise to front fees and the AAA rule providing for fee-shifting both alleviate any potential cost-prohibitiveness concerns. As to the first point, the defendants' promise rings hollow: they have already once failed to honor a similar promise and, regardless, they have expressly reserved the right to enforce the fee-shifting provision at the *end* of the proceedings.  Whether the plaintiffs receive a bill at the beginning or at the end of the proceedings, they cannot afford to pay it – thus, "kicking the can down the road" does not alleviate the court's fundamental concern.  Finally, it is not lost on the court that the defendants in fact sought to recover *all* of the arbitration costs at the end of the First Set of Kentucky Arbitration Proceedings and now seek to recover $10,000 from each plaintiff in the Second Set of Kentucky Arbitration Proceedings.  The defendants have not foreclosed themselves from similarly demanding recovery of half or all of the arbitration costs – not to mention additional damages for allegedly breaching the arbitration agreement.

As to the second point, the possibility of fee-shifting by the arbitrator similarly provides cold comfort.  The defendants have not provided the court with any indication of the likelihood that an arbitrator, notwithstanding the fee-shifting provision in the Arbitration Clause, would shift fees against the defendants and in favor of the plaintiffs.  Moreover, such fee-shifting would

---

[28]Even if the court were to assume that the plaintiffs' claims could or would proceed under the Consumer Supplementary Procedures, the court would find that the plaintiffs cannot afford to pay the $375+ fee.

likely take place over the defendants' own objection. In sum, the defendants have presented no evidence from which this court can reasonably assume that an arbitrator ultimately would assess all of the fees against the defendants at the conclusion of the arbitration.

Thus, even if the court were to credit the defendants' promise to front the initial arbitration costs, the legitimate risk that the plaintiffs would ultimately be saddled with their share of the fees (or even more) – which they demonstrably cannot afford to pay – understandably would deter the plaintiffs from pursuing their claims.

**F.      The Court's Findings Regarding the Delegation Provision**

If the defense of cost-prohibitiveness under Kentucky law has any practical application, it must apply to the plaintiffs in this case. The plaintiffs, including several plaintiffs who have *no income whatsoever*, manifestly cannot afford to pay an arbitrator to decide whether the arbitration agreement is enforceable. Therefore, if the court were to enforce the Delegation Provision, the plaintiffs would effectively be foreclosed from pursuing their claims because of cost-prohibitiveness.

The plaintiffs' circumstances here are distinguishable from the plaintiffs' circumstances in *Schnuerle*. In *Schnuerle*, the plaintiffs each possessed exceedingly low-value individual claims (approximately $40 each) that, under the express terms of the arbitration agreement at issue, they could have advanced through state small claims procedures – the same option they had in the absence of the arbitration agreement. The plaintiffs simply chose not to avail themselves of small claims court because it was "not worth the trouble" to do so, not because it was cost-prohibitive. Therefore, the plaintiffs were not foreclosed from utilizing an alternative forum to pursue their claims at negligible out-of-pocket cost, albeit with some degree of inconvenience. Here, by contrast, the plaintiffs are essentially trapped: under the Arbitration

Clause and associated Delegation Provision, they must arbitrate any disputes relating to their enrollment at Daymar, including the issue of arbitrability, but they cannot afford to do so. Unlike the factual circumstances in *Schnuerle*, it is not a matter of convenience for these plaintiffs: if the court were to enforce the Delegation Provision, the plaintiffs would be financially foreclosed from pursuing their claims in any forum. That is precisely the result that Kentucky law sensibly seeks to avoid.

Thus, under applicable Kentucky law, the court will not enforce the Delegation Provision and will proceed to address the enforceability of the Arbitration Clause.

## V. <u>Application of Cost-Prohibitiveness Defense to the Arbitration Clause</u>

The costs of arbitrating the plaintiffs' claims to completion would likely cost substantially more than would resolving the issue of arbitrability. Even if the court were to assume that, as with an arbitration on the issue of arbitrability, an arbitration concerning all eight plaintiffs' claims (if not those of the putative class members, as well) would take just one day and the same amount of arbitrator time, the plaintiffs could not pay the arbitration costs for the reasons stated above.

Moreover, an arbitration on the merits would take significantly more hearing days and arbitrator time than an arbitration simply on the issue of arbitrability. For instance, in the First Set of Kentucky Arbitration Proceedings, the arbitrator required four days of hearings to address the claims asserted by just four plaintiffs, which ultimately cost the parties a combined total of almost $22,000 – or about $3,000 per plaintiff after the fee split. Here, if the arbitration took place under the Commercial Rules collectively with respect to just the eight named plaintiffs, required 1 day per plaintiff of hearing time, and necessitated the equivalent of one-half day per plaintiff both before and after the hearing, the outcomes could be as follows:

1.      Collective Action & $150,000-$300,000 in aggregated damages: $2,800 Initial Filing Fee + $1,250 Final Fee + $12,000 for hearings + arbitrator fees:
        Cost per Plaintiff @$150/hour = **$1,603.13**
        Cost per Plaintiff @$300/hour = **$2,078.13**

2.      Collective Action & $300,000-$500,000 in aggregated damages = $4,350 Initial Filing Fee + $1,750 Final Fee + $12,000 for hearings + arbitrator fees:
        Cost per Plaintiff @150/hour = **$1,731.25**
        Cost per Plaintiff @300/hr = **$2,331.25**

Of course, if the plaintiffs were permitted to proceed as a class action, the costs could be much higher. If the plaintiffs proceed individually and the claims require just a two-day hearing and one day's worth of arbitrator time both before and after the hearing, the outcomes are as follows:

1.      Individual Action Valued Between $10,000 and $75,000: $775 Initial Filing Fee + $200 Final Fee + $3,000 for hearing + arbitrator's fees:
        Cost per Plaintiff @$150/hour = **$3,187.50**
        Cost per Plaintiff @$300/hour = **$4,387.50**

2.      Individual Action Valued Between $75,000 and $150,000: $1,850 Initial Filing Fee + $750 Final Fee + $3,000 for hearing + arbitrator's fees:
        Cost per Plaintiff @$150/hour = **$4,000**
        Cost per Plaintiff @$300/hour = **$5,200**

Furthermore, if the proceedings involve discovery disputes, dispositive motions, pre-hearing motions, and/or post-hearing motions, the arbitrator would likely expend additional time and/or hearing days resolving those disputes, thereby driving up the arbitration costs much further.

At any rate, under any of these scenarios – which involve exceedingly conservative assumptions to begin with – the arbitration costs would be prohibitively expensive to the plaintiffs, particularly if they are forced to proceed individually. Thus, the arbitral forum does not provide the plaintiffs with a meaningful opportunity to vindicate their rights. Again, this is the type of result that Kentucky law seeks to avoid. *See Schnuerle*, 2012 WL 3631378, at *8.

Accordingly, the court will not enforce the Arbitration Clause with respect to these plaintiffs.[29]

## VI. Remaining Arguments

The plaintiffs argue that (1) the Arbitration Clause is unconscionable for additional reasons, (2) they cannot be forced to arbitrate class claims or antitrust claims, and (3) they cannot be forced to arbitrate their claims against defendant Mark Gabis. Because the court finds that the Arbitration Clause will not be enforced on the basis of cost-prohibitiveness alone, the court need not address these arguments.

Also, the defendants contend that the court should simply sever the fee-shifting provision in the Arbitration Clause. Even if the court could sever this provision in the absence of a severability clause, it would not affect the court's findings, because the plaintiffs would still face the prospect of paying arbitration costs that they cannot afford pursuant to the AAA default rules.

## CONCLUSION

For the reasons stated herein, the Motion to Compel Arbitration will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[29]The court's holding is limited to the eight named plaintiffs. Thus, the court makes no finding as to whether enforcing the Delegation Provision and/or the Arbitration Clause would be cost-prohibitive with respect to members of the putative class, whose particular circumstances may be materially different from those of the eight named plaintiffs.